No. 24-2203

# United States Court of Appeals for the Federal Circuit

**NETLIST, INC.,**

*Plaintiff-Appellee,*

*v.*

**SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC., SAMSUNG SEMICONDUCTOR, INC.,**

*Defendants-Appellants.*

APPEAL FROM UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TEXAS IN CASE NO. 2:21-CV-00463-JRG

## DEFENDANTS-APPELLANTS' REPLY BRIEF

Ruffin B. Cordell
Lauren A. Degnan
Michael J. McKeon
Michael J. Ballanco
Benjamin J. Christoff
FISH & RICHARDSON P.C.
1000 Maine Avenue S.W., Suite 1000
Washington, DC 20024
Tel: (202) 783-5070
cordell@fr.com

Francis J. Albert
FISH & RICHARDSON P.C.
12860 El Camino Real, Suite 400
San Diego, CA 92130
Tel: (858) 678-5070

Alexander Pechette
FISH & RICHARDSON P.C.
One Marina Park Drive
Suite 1700
Boston, MA 02210
Tel: (617) 542-5070

May 19, 2025

*Attorneys for Defendants-Appellants*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Defendants-Appellants Samsung Electronics Co., Ltd., Samsung

Electronics America, Inc., and Samsung Semiconductor, Inc. (collectively,

"Samsung" or "Defendants-Appellants") certify the following:

1.    Provide the full names of all entities represented by undersigned counsel in this case.

**Samsung Electronics Co., Ltd.; Samsung Electronics America, Inc.; and Samsung Semiconductor, Inc.**

2.    Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

**None/Not Applicable**

3.    Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

**Samsung Electronics Co., Ltd.; Samsung Electronics America, Inc.**

4.    List all law firms, partners, and associates that (a)appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

**Fish & Richardson P.C.:  Brian Livedalen, Sara Fish, Anthony V. Nguyen, Thomas H. Reger, II, Katherine Reardon, Matt Colvin, Jeffrey H. Burton, Karolina Jesien, Matthew Mosteller, Daniel A. Tishman**

**Gillam & Smith LLP:  Melissa Richards Smith, Andrew T. Gorham, James Travis Underwood**

**Covington & Burling LLP:  Brian R. Nester, Peter A. Swanson, R. Jason Fowler, Alice J. Ahn**

5.    Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

**Yes (*see* Samsung's Notice of Related Case Information filed at Dkt. 6)**

i

6.     Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

**None/Not Applicable**

Dated:  May 19, 2025               */s/ Ruffin B. Cordell*
                                        Ruffin B. Cordell

# **TABLE OF CONTENTS**

CERTIFICATE OF INTEREST ................................................................ i

TABLE OF AUTHORITIES ................................................................ vi

ARGUMENT ................................................................................... 1

I.    The Infringement Verdict Lacks Substantial Evidence Support ..................... 1

    A.    The '060 and '160 Patent Infringement Verdict Is
        Unsupported ......................................................................... 1

        1.    Netlist Improperly Relitigates the "DRAM
            Circuit" Claim Construction ................................ 1

        2.    No Substantial Evidence Supports Brogioli's
            "DRAM Circuit" Redefinition, on Which
            Infringement Rests ................................................ 3

        3.    The Court Should Reject Netlist's Remaining
            Arguments ........................................................... 5

    B.    The '054 and '918 Patent Infringement Verdict Lacks
        Substantial Evidence .......................................................... 6

        1.    The Accused Products Do Not Meet the '054
            Patent's "Second Operable State" Limitation ........... 6

        2.    The Accused Products Do Not Meet the '918
            Patent's "Converter Circuit" Limitation .................. 9

    C.    Substantial Evidence Does Not Support Infringement of
        the '339 Patent ................................................................. 11

        1.    The "Byte-Wise Data Paths" Limitation Is Not
            Satisfied ............................................................ 11

        2.    Samsung's Appeal Is Not Moot ............................ 13

II.    Substantial Evidence Does Not Support the Damages Verdict ..................... 14

A.    Netlist Concedes Kennedy's Proposed Royalty Reflected Revenues, Not Profits ........................................................ 14

B.    Kennedy's 100%-of-Revenue Rule of Thumb Cannot Stand ................................................................................ 17

C.    Substantial Evidence Does Not Support Kennedy's Failed Apportionment Attempts ................................... 20

    1.    The '054 and '918 Patents' Alleged Technical Benefit Includes Unpatented and/or Prior-Art Features ............................................................... 20

    2.    The '339 Patent's Alleged Technical Benefit Is Unpatented and in the Prior Art ............................. 22

    3.    The '060 and '160 Patents' Alleged Technical Benefit Is Unpatented and in the Prior Art ............. 22

D.    Netlist Failed To Show Its Noninfringing Alternatives Were Available and Acceptable ................................ 23

III.    The District Court Abused Its Discretion by Admitting Kennedy's Flawed Testimony ............................................... 25

A.    The District Court Should Have Excluded Kennedy's Comparable License Analysis ....................................... 25

    1.    Netlist Acknowledges Its Technical Expert Failed To Analyze 99.4% of the Licensed Rambus Patents ................................................................... 25

    2.    Netlist Fails To Address the Inconsistency in Kennedy's Treatment of the Rambus, JDLA, and SK hynix Licenses ................................................. 30

B.    Kennedy's Parroting of Groehn's Regression Analysis Requires a New Damages Trial ...................................... 30

    1.    Testifying Experts Cannot Be Mouthpieces for Non-Testifying Experts ........................................ 30

2.     Groehn's DDR4 Regression Analysis Ignores
       DDR5 Prices ............................................................... 33

CONCLUSION ................................................................. 34

CERTIFICATE OF SERVICE AND FILING ....................................... 35

CERTIFICATE OF COMPLIANCE ............................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acceleration Bay LLC v. 2K Sports, Inc.*,
15 F.4th 1069 (Fed. Cir. 2021) ........................................................... 31

*Agrizap, Inc. v. Woodstream Corp.*,
520 F.3d 1337 (Fed. Cir. 2008) ........................................................ 6, 7

*Akamai Technologies, Inc. v. Limelight Networks, Inc.*,
805 F.3d 1368 (Fed. Cir. 2015) ............................................................ 8

*Albritton v. Acclarent, Inc.*,
No. 3:16-CV-03340-M, 2020 WL 11627275 (N.D. Tex. Feb. 28,
2020) ................................................................................................ 24, 27

*Alexsam, Inc. v. IDT Corp.*,
715 F.3d 1336 (Fed. Cir. 2013) ............................................................ 8

*Apple Inc. v. Motorola, Inc.*,
757 F.3d 1286 (Fed. Cir. 2014) ......................................................... 32

*Apple Inc. v. Wi-LAN Inc.*,
25 F.4th 960 (Fed. Cir. 2022) ............................................................ 26

*Aqua Shield v. Inter Pool Cover Team*,
774 F.3d 766 (Fed. Cir. 2014) ...................................................... 15, 16

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
876 F.3d 1350 (Fed. Cir. 2017) ......................................................... 32

*Aro Manufacturing Co. v. Convertible Top Replacement Co.*,
377 U.S. 476 (1964) ........................................................................... 16

*AstraZeneca AB v. Apotex Corp.*,
782 F.3d 1324 (Fed. Cir. 2015) .................................................... 16, 21

*Baran v. Med. Device Techs., Inc.*,
616 F.3d 1309 (Fed. Cir. 2010) ......................................................... 12

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
　616 F.3d 1249 (Fed. Cir. 2010) ............................................................8

*Comcast IP Holdings I LLC v. Sprint Communications Co.*,
　850 F.3d 1302 (Fed. Cir. 2017) .....................................................5, 10

*DataTreasury Corp. v. Wells Fargo & Co.*,
　No. 2:06-CV-72 DF, 2011 WL 8810604 (E.D. Tex. Aug. 2, 2011) .................24

*Daubert v. Merrell Dow Pharms., Inc.*,
　509 U.S. 579 (1993)...............................................................15, 17, 29

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*,
　285 F.3d 609 (7th Cir. 2002) .......................................................32, 33

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
　363 F.3d 1263 (Fed. Cir. 2004) .......................................................3, 4

*In re Ecast, Inc.*,
　96 F. App'x 710 (Fed. Cir. 2004) ......................................................23

*ePlus, Inc. v. Lawson Software, Inc.*,
　700 F.3d 509 (Fed. Cir. 2012) ..........................................................10

*Factory Mut. Ins. Co. v. Alon USA L.P.*,
　705 F.3d 518 (5th Cir. 2013) .......................................................31, 32

*Ferrera & DiMercurio v. St. Paul Mercury Ins. Co.*,
　240 F.3d 1 (1st Cir. 2001)................................................................32

*Finjan, Inc. v. Blue Coat Systems, Inc.*,
　879 F.3d 1299 (Fed. Cir. 2018) ..........................................................8

*Fresenius Med. Care Holdings, Inc., v. Baxter Int'l, Inc.*,
　No. C 03-01431 SBA, 2006 WL 1646113 (N.D. Cal. June 12,
　2006) ........................................................................................24

*Garretson v. Clark*,
　111 U.S. 120 (1884)........................................................................21

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
　185 F.3d 1341 (Fed. Cir. 1999) .........................................................23

*Intel Corp. v. Qualcomm Inc.*,
  21 F.4th 801 (Fed. Cir. 2021) ........................................................11, 12

*Intell. Sci. & Tech., Inc. v. Sony Elecs., Inc.*,
  589 F.3d 1179 (Fed. Cir. 2009) .............................................................3

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
  694 F.3d 51 (Fed. Cir. 2012) ........................................................27, 28

*Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*,
  895 F.2d 1403 (Fed. Cir. 1990) ....................................................17, 18

*Mars, Inc. v. Coin Acceptors, Inc.*,
  527 F.3d 1359 (Fed. Cir. 2008) ....................................................23, 24

*Mike's Train House, Inc. v. Lionel, L.L.C.*,
  472 F.3d 398 (6th Cir. 2006) ...............................................................32

*Mirror Worlds Technologies, LLC v. Meta Platforms, Inc.*,
  122 F.4th 860 (Fed. Cir. 2024) ............................................................10

*MLC Intell. Prop., LLC v. Micron Tech., Inc.*,
  10 F.4th 1358 (Fed. Cir. 2021) .....................................................25, 28

*MobileMedia Ideas LLC v. Apple Inc.*,
  780 F.3d 1159 (Fed. Cir. 2015) .............................................3, 9, 11

*MTD Prods. Inc. v. Iancu*,
  933 F.3d 1336 (Fed. Cir. 2019) ...........................................................10

*Netlist Inc. v. Samsung Electronics Co. Ltd.*,
  No. 8:20-cv-00993 (C.D. Cal.) ............................................................26

*Olabisiomotosho v. City of Houston*,
  185 F.3d 521 (5th Cir. 1999) ...............................................................19

*Powell v. Home Depot U.S.A., Inc.*,
  663 F.3d 1221 (Fed. Cir. 2011) ...........................................................16

*Prism Techs. LLC v. Sprint Spectrum L.P.*,
  849 F.3d 1360 (Fed. Cir. 2017) ...........................................................24

*ResQNet.com, Inc. v. Lansa, Inc.*,
  594 F.3d 860 (Fed. Cir. 2010) ........................................................16, 24

*Riles v. Shell Expl. & Prod. Co.*,
  298 F.3d 1302 (Fed. Cir. 2002) ...........................................................13

*Rite-Hite Corp. v. Kelley Co., Inc.*,
  56 F.3d 1538 (Fed. Cir. 1995) .............................................................16

*Trell v. Marlee Elecs. Corp.*,
  912 F.2d 1443 (Fed. Cir. 1990) .....................................................25, 28

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011) .......................................17, 20, 27, 29

*United States v. Grey Bear*,
  883 F.2d 1382 (8th Cir. 1989) .............................................................32

*Versata Software Inc. v. SAP America, Inc.*,
  717 F.3d 1255 (Fed. Cir. 2013) .....................................................15, 17

*VLSI Tech. LLC v. Intel Corp.*,
  87 F.4th 1332 (Fed. Cir. 2023) .......................................14, 15, 21, 32

*Wash World Inc. v. Belanger Inc.*,
  131 F.4th 1360 (Fed. Cir. 2025) .........................................................26

*Zygo Corp. v. Wyko Corp.*,
  79 F.3d 1563 (Fed. Cir. 1996) .............................................................23

**Other Authorities**

Fed. R. Evid. 702(b)................................................................................33

# ARGUMENT

## I.    The Infringement Verdict Lacks Substantial Evidence Support

### A.    The '060 and '160 Patent Infringement Verdict Is Unsupported

#### 1.    Netlist Improperly Relitigates the "DRAM Circuit" Claim Construction

Netlist cannot dispute that "the claimed 'array dies' exclude ***all*** DRAM circuits."  RB32.  DRAM circuits—stacked DRAM memory dies, each containing millions of DRAM memory cells—make up Samsung's accused HBM products.  Appx5572-73.  When the district court found Netlist disclaimed all DRAM circuits and rejected Netlist's proposed disclaimer limited to only the DRAM circuits "as stacked" in Rajan137, Netlist could not prove infringement.  Appx1153-54; Appx1380-81.  Netlist acknowledged as much by asking the court to narrow its disclaimer.  Appx1386-87.  Netlist admits it subsequently withdrew its objections.  Rather than accepting the district court's ruling, at trial Netlist unilaterally circumscribed "DRAM circuit" to only those DRAM circuits with Rajan137's supposed external "wire bonds."  RB13, 32.[1]  Netlist's position is that an expert may redefine the plain term "DRAM circuits" as only DRAM circuits having one interconnection type (wire bonding) among the many that exist.  There is no legal or factual support for this disclaimer relitigation.

---

[1] Netlist cites Brogioli's testimony that DRAM circuits are "monolithic," RB13, but focuses on only Brogioli's external wire bonding testimony.

Netlist expert Brogioli needed to apply the ***plain meaning*** of "DRAM circuit" ***in the field***.  Yet, he evaded questioning about that meaning, feigning ignorance, or insisting it depends on "context."  Appx5550; Appx5554-60; Appx5563-65; Appx5571-73.  Brogioli and Netlist were clear that they relitigated "DRAM circuit" apart from any understanding in the field.  *E.g.*, Appx5498-99; Appx5505-06; Appx5514; Appx5572-73; *see also* RB30-31.  Netlist never offered a plain meaning of DRAM circuit and applied only its "must include wire-bonding" definition.

Moreover, Netlist identifies nothing outside of Brogioli's litigation-induced statements supporting its arbitrary "DRAM circuit" redefinition.  Netlist and Brogioli admit that in academia (including Brogioli's own writings), Netlist's 10-K, and the inventor's understanding, wire bonding does not characterize "DRAM circuits."  RB30; Appx5552-53; Appx5560-72.  Their admissions align with Samsung expert Robins's unrebutted opinion that a POSITA would understand "DRAM circuit" to mean well-known DRAM cells both individually and collectively regardless of interconnection type—the only expert opinion on the matter.  Appx6064-65; Appx6071; Appx6073; Appx6075; Appx6101.  Nothing in "DRAM circuits" implies an interconnection method, much less requires wire bonds.  Netlist's impermissible relitigation of "DRAM circuit" should be rejected.

*Intell. Sci. & Tech., Inc. v. Sony Elecs., Inc.*, 589 F.3d 1179, 1184-85 (Fed. Cir. 2009) (claims' plain meaning governs infringement).

### 2.    No Substantial Evidence Supports Brogioli's "DRAM Circuit" Redefinition, on Which Infringement Rests

Netlist relies on Brogioli's disclaimer relitigation to pursue infringement. RB25-26 (citing Appx5497-98).  "Conclusory statements by an expert, however, are insufficient to sustain a jury's verdict." *MobileMedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1172 (Fed. Cir. 2015) (citation omitted); *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1278 (Fed. Cir. 2004) (rejecting expert's "conclusory assertions" that "contradict [words'] plain meaning").

Netlist cites nothing in the '060 and '160 specifications supporting Brogioli's "DRAM circuit" redefinition, *see* RB31, nor anything substantial from the prosecution.  For Rajan137, Netlist states (falsely) that Samsung does not dispute Rajan137's figures show wire bonding.  *See* RB34; *but see* BB22.  Even if a POSITA interpreted Rajan137's bus lines (Appx16341-45; Appx16360) as wire bonds, rather than logical representations of signals, those bus lines do not show DRAM circuits are ***limited*** to that connection type.  Rajan137 instead clearly explains that "[t]he electrical connections . . . may be configured in any desired manner." BB22 (quoting Appx16360; Appx6072-74).

Netlist also does not meaningfully grapple with its contradictory IPR position.  Netlist does not dispute that the Riho IPR reference and the accused

products both use TSVs.  Here, Netlist argues the accused products lack "DRAM circuits" because they have TSVs (rather than external wire bonds); in IPR, Netlist denied that TSVs impacted Riho's DRAM circuit status and said nothing about wire bonds.  Appx22054-70.

Brogioli's redefinition of "DRAM circuits" also contradicts inventor Lee. RB30.  Netlist attempts to distinguish DRAM circuits from DRAM dies, alleging that only DRAM circuits, not DRAM dies, have wire bonding.  But Lee testified that both are understood as "DRAM" in the field.  Appx5552-53.  Also, in a linguistic legerdemain, Netlist replaces "dies," about which Lee testified, with the claim term, "*array dies*," about which he did not, to suggest Lee distinguished "DRAM circuits" from the claimed DRAM array dies.[2]  Lee's testimony lends no support to this alleged distinction.  *Id*.; Appx5861.

None of Netlist's other cited material supports Brogioli's "DRAM circuit" redefinition.  Netlist cites **its counsel's questions** that **assume** "DRAM circuits" are limited to wire bonding, but testimony never establishes that assumption. RB26-27 (citing Appx6041-42); RB28-29 (citing Appx5657-58); Appx5662-63. The testimony Netlist highlighted in closing, *see, e.g.*, Appx22112, merely contrasts one type of DRAM circuit with the accused products (which are another

---

[2] Unless noted, all emphasis added.

type of DRAM circuit) and never showed that DRAM circuits are limited to wire bonding.

Samsung's experts never accepted Brogioli's redefinition of "DRAM circuit." *Contra* RB28 (citing Appx6041-42, Appx6045); RB29 (citing Appx6108). Robins and the Samsung documents he cited in no way support Brogioli's redefinition. McAlexander was not an expert for the '060 and '160 patents, offered no opinion on the plain meaning of "DRAM circuit," and the district court limited Netlist's cross-examination of McAlexander about these patents to a different issue—comparability of the Rambus license. Appx6042-45.

Finally, Netlist cites evidence showing that (1) Samsung's accused products use TSVs and internal data ports, RB28; and (2) TSVs differ from external wire bonding. RB27-28. These noncontroversial assertions are relevant only if "DRAM circuits" requires wire bonding, which Netlist never established. Samsung's products are DRAM circuits—and thus do not infringe.

### 3.    The Court Should Reject Netlist's Remaining Arguments

Netlist argues that there are other reasonable views of a POSITA's understanding of "DRAM circuit" besides Robins's, citing *Comcast IP Holdings I LLC v. Sprint Communications Co.*, 850 F.3d 1302, 1311-12 (Fed. Cir. 2017). RB29-30. In *Comcast*, the Court held a recited "call destination" encompassed multiple possible destinations based on surrounding claim language. 850 F.3d at

1306, 1312.  Here, in contrast, Brogioli jettisoned the plain meaning of "DRAM circuit" and adopted an arbitrary definition of "DRAM circuit" not supported by other claim language—or any evidence beyond his *ipse dixit* say-so—and calculated to generate an infringement finding notwithstanding the district court's construction.  *See supra* § I.A.1.  Because Robins's opinion is consistent with the record whereas Brogioli's is not, Robins's "DRAM circuit" interpretation *is* the only reasonable one.

*Agrizap, Inc. v. Woodstream Corp.*, 520 F.3d 1337, 1342 (Fed. Cir. 2008), does not bar this Court from concluding that Brogioli's conclusory opinion is impermissible.  In a damages opinion, an expert gave the jury enough evidence to "fairly estimate an amount of damages."  *Id.*  Here, Netlist identifies no evidence supporting Brogioli's conclusory disclaimer relitigation, so there is nothing for this Court to weigh.  The Court should reverse.

### B.    The '054 and '918 Patent Infringement Verdict Lacks Substantial Evidence

#### 1.    The Accused Products Do Not Meet the '054 Patent's "Second Operable State" Limitation

Because the infringement verdict hinges on Netlist expert Mangione-Smith's conclusory and unsupported redefinition of "second operable state" (construed as "state in which the memory module is operated after transition") to read on a demonstrably ***non***-operable (i.e., off) state, the Court should reverse.

Netlist does not dispute key points.  Under Netlist's "second operable state" theory, the accused products' DRAMs are turned off, incapable of performing basic memory operations, like reading or writing data.  BB28; RB35-38.  However, the '054 patent's focus, and its only "second operable state" teaching, involves preserving data during a voltage fault by transferring it to flash memory while the DRAMs are operable.  BB28; RB35-38.  The specification nowhere suggests that the "second operable state" includes a memory module that is turned off and *incapable* of performing any memory operations.  BB29; RB35-38.  These facts are undisputed.

Netlist denies that the four powered components are "low-level" circuitry irrelevant to memory operations, but Netlist identifies no memory-related operation they perform—just the wake-up function.  RB37.  Netlist clings to Mangione-Smith's opinion that the PMIC component increases power efficiency, *id*. (citing Appx5333; Appx5382-83), but he never explained how that purported improvement relates to the accused products' alleged "second operable state" or whether it corresponds to a memory operation.  Ultimately, four Samsung components receive power to await a "wake-up" signal to make the then *non*-operable memory, operable—unlike the claimed "second operable state."  BB30; RB35-38.

7

Mangione-Smith's conclusory redefinition to transform an off state into an operable state eviscerates the claim, and thus cannot be substantial evidence to sustain the verdict. *Alexsam, Inc. v. IDT Corp.*, 715 F.3d 1336, 1342 (Fed. Cir. 2013); *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1260 (Fed. Cir. 2010). Indeed, Netlist identifies no support for a POSITA understanding that "operable" means "off," and never accounts for its departure from the specification. *See* RB35-38.

*Akamai Technologies, Inc. v. Limelight Networks, Inc.*, 805 F.3d 1368, 1376 (Fed. Cir. 2015), is inapplicable. There, after the parties agreed upon a construction, the defendant sought to narrow the construction, but failed to present intrinsic record support for disavowal or lexicography. *Id.* at 1374-75. In contrast, Samsung embraced the district court's plain language construction at trial. *See, e.g.*, Appx6384-85. *Finjan, Inc. v. Blue Coat Systems, Inc.*, similarly involved a construction first advanced after trial, which this Court rejected because the jury's application of the claim language comported with the asserted patent's disclosure. 879 F.3d 1299, 1302, 1306-07 (Fed. Cir. 2018). Here, Mangione-Smith's conclusory redefinition of the claim bears no relationship to the specification.

The jury's infringement verdict should be reversed.

8

### 2.   The Accused Products Do Not Meet the '918 Patent's "Converter Circuit" Limitation

The '918 patent infringement verdict rests on Mangione-Smith's conclusory, and impermissibly functional, redefinition of "converter circuit," and should be reversed.  *MobileMedia*, 780 F.3d at 1172.

Netlist does not dispute that reducing a non-§ 112, ¶6 claim limitation to mere function is prohibited.  *See* BB31-32; RB38-40.  Nor does Netlist dispute that Mangione-Smith opined that "converter circuits" allegedly encompass any circuitry that converts a voltage, including low drop-out regulators (LDOs).  BB32; RB38-40 (citing Appx5338-39).  Netlist identifies no evidence rebutting McAlexander's evidence-based opinion that a POSITA would recognize "converter circuits" as distinct from LDOs.  BB33-35; RB38-40.

Netlist also cites no substantial evidence supporting Mangione-Smith's purely functional understanding of "converter circuit."  BB32; RB38-40.  Netlist quotes its counsel's assertions that LDOs are converter circuits while ignoring the witnesses' clarifications that LDOs are regulators, not converters.  RB38 (citing Appx5667; Appx5970).  Similarly, Netlist cites its lawyer slipping "LDO *converter*" into an irrelevant question about supplying power after an undervoltage/overvoltage.  RB38 (citing Appx5965).  The testimony that LDOs perform the function of changing a voltage, RB38 (quoting Appx5338-39; Appx5650; Appx5968; Appx5971-72; Appx5974), simply describes an attribute of

9

an LDO; it does not prove that a "converter circuit" encompasses **any** voltage-altering device.

Netlist's reliance on *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 520 (Fed. Cir. 2012), ignores its expert's failure to apply the plain meaning of "converter circuit." There, the jury reasonably viewed the claim language as silent on a claim requirement that the defendant advanced after trial. *Id.* Here, Samsung seeks application of the evidence-based plain meaning of the claim language to a POSITA. Mangione-Smith veered from that plain meaning by applying a purely functional redefinition of "converter circuit."

Netlist misapplies *Mirror Worlds Technologies, LLC v. Meta Platforms, Inc.*, 122 F.4th 860, 871 (Fed. Cir. 2024), to argue that "converter circuit" has a broad yet permissible scope. That case does not excuse stripping a claim term of all structure, as Netlist did here. *Id.* at 871-72; Appx5419-20; Appx6258. Contrary to the district court's finding, "electrical components for voltage conversion" does not meaningfully connote structure but includes all possible structure, illustrating the purely functional interpretation Netlist applied here. *MTD Prods. Inc. v. Iancu*, 933 F.3d 1336, 1343-45 (Fed. Cir. 2019); Appx5419-20.

Nor does *Comcast* require this Court to adopt Mangione-Smith's functional definition of "converter circuit." *Contra* RB40. There, the claim language facially accommodated the jury's interpretation, 850 F.3d at 1311-12; here, no claim

10

language or other evidence corroborates Mangione-Smith's conclusory redefinition of "converter circuit," RB38-40.  The Court should reverse.

### C. Substantial Evidence Does Not Support Infringement of the '339 Patent

#### 1. The "Byte-Wise Data Paths" Limitation Is Not Satisfied

Mangione-Smith's conclusory redefinition of "byte-wise," vitiating the requirement altogether, cannot support the verdict.  *MobileMedia*, 780 F.3d at 1172.

Mangione-Smith did not opine on the plain meaning of "byte-wise" to a POSITA; he simply rejected the accepted definition (i.e., eight-bit/byte wide) and claimed "byte-wise" covers any number of bits despite admitting being unfamiliar with the term.  Appx5456-57; *see also* Appx5394-95.  Netlist does not dispute that: (1) Mangione-Smith's "byte-wise" redefinition encompasses *any* number of bits, *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 810 (Fed. Cir. 2021), or (2) Samsung's accused products contain, as relevant here, only one eight-bit write data path. RB43-45.  Under these circumstances, no reasonable jury could find infringement.

Netlist misapprehends the specification, which shows "byte-wise" meaning eight bits, and never suggests "byte-wise" means "measured in terms of fractions of bytes."  Appx5456-57.  Netlist conceded before the district court that the specification's teachings about Figures 4A and 4B describe *buffer 416* as "byte-wise," and that the buffer has "a total bit width of *8*."  Appx18101; *see also*

Appx592 (14:1-3) (buffer "416 of FIG. 4B has a total bit width of 8 bits");

Appx583. Netlist now wrongly alleges that the specification "*expressly*" uses the

term "byte-wise" in connection with "paths" downstream from buffer 416, RB44

(emphasis original). Appx592 (13:31-14:18). Instead, the specification calls

buffer 416 "byte-wise," precisely because it is eight bits wide. *Id.* The patent's

explanation that the buffer could theoretically have various bit widths, but only the

eight-bit width of buffer 416 shown in Figures 4A-4B "serve[s] as a 'byte-wise'

buffer," *id.*, undermines Netlist's reading.

The specification's use of "byte-wise" interchangeably with eight-bit/byte-

wide overcomes any presumption that "byte-wise" should be construed differently,

and thus Netlist's identified terminological flavors are irrelevant. *Baran v. Med.

Device Techs., Inc.*, 616 F.3d 1309, 1316 (Fed. Cir. 2010); RB44-45. Netlist

disagrees "that 'wise' is the adjectival form of 'wide,'" but it never disputes that

the claim uses "byte-wise" and "byte wide" for different grammatical purposes,

removing any logical value of comparing/contrasting the terms. RB44; BB40-41;

Appx595. "N-bit-wide" and "nibble-wide" also undercut Mangione-Smith's

definition by showing the patentee chose "byte" over other options. BB39-40;

RB45. Indeed, Netlist never explains the difference between "N-bit-wide" and

Mangione-Smith's "byte-wise" definition ("measured in terms of bytes"); yet per

Netlist, the different terms must mean different things. The Court should reject Mangione-Smith's infringement-seeking definition of "byte-wise."

### 2.    Samsung's Appeal Is Not Moot

Samsung's noninfringement challenge for the "byte-wise" data paths requirement is not moot. RB41-42. The limitation refers to the bit width of the write data paths in a buffer. *See supra* § I.C.1. Netlist's alleged independent infringement ground corresponds to a distinct claim requirement ("drive"/fork-in-the-road), relating to the number of possible write data paths in the buffer. Appx8-10. Samsung's challenge to "byte-wise" suffices for reversal. *Riles v. Shell Expl. & Prod. Co.*, 298 F.3d 1302, 1308 (Fed. Cir. 2002).

Netlist improperly merges the district court's fork-in-the-road construction analysis with that of the byte-wise data paths limitation. RB41-42; Appx8-10. The parties and court addressed "byte-wise" data paths and fork-in-the-road separately. Appx8-10; Appx18023-28; Appx18096-101; Appx18179-81; Appx18212-14. Importantly, the district court never suggested that the read-path/write-path combination satisfies the "byte-wise" data path limitation. Appx8-10. Instead, when discussing the fork-in-the-road requirement, the court explained that it was analyzing the application of the "drive" ***construction*** to the evidence. *Id.* The district court was not analyzing the surrounding claim language, such as the "write data" requirement or the "byte-wise" requirement at issue here. *Id.*

Unsurprisingly, none of Netlist's cases endorse using evidence relating to one claim limitation to support infringement for a different limitation in the manner Netlist proposes.  RB41-42.

Netlist also ignores the claim language requiring multiple byte-wise write data paths in each byte-wise buffer.  Claim 1 recites: "a plurality of byte-wise buffers . . . wherein each . . . has . . . a byte-wise data path," and "the byte-wise data path is enabled . . . to actively ***drive a respective byte-wise section*** of the N-bit wide ***write data*** . . . ."  Appx595 (19:40-61).  The district court construed "drive" so that, when read with its surrounding language, the claim requires a fork-in-the-road—i.e., multiple possible byte-wise write data paths—within the buffer.  Appx1356-59.  Netlist fails to explain how a reasonable juror could find that a byte-wise ***read*** data path satisfies the byte-wise ***write*** data path requirement.

Samsung's challenge to the "byte-wise" data paths limitation is not moot.

## II.    Substantial Evidence Does Not Support the Damages Verdict

### A.    Netlist Concedes Kennedy's Proposed Royalty Reflected Revenues, Not Profits

Netlist's acknowledgement that Kennedy relied solely on "incremental ***revenue***" instead of profit alone warrants JMOL.  RB46-47, 49.  This Court has recognized "the role of ***profits*** (***not revenues*** per se) in the inquiry."  *VLSI Tech. LLC v. Intel Corp.*, 87 F.4th 1332, 1347 (Fed. Cir. 2023).  "[A]nticipated incremental profits under the hypothesized conditions are conceptually central to

14

constraining the royalty negotiation." *Aqua Shield v. Inter Pool Cover Team*, 774

F.3d 766, 772 (Fed. Cir. 2014) (citation omitted).  Introducing revenue evidence

alone is insufficient and is a fatal flaw for Netlist.

Netlist incorrectly contends this error concerns Kennedy's methodology and

is not a sufficiency-of-evidence issue.  RB49.  It is both.  Kennedy's methodology

was unsound because he considered revenues only.  *VLSI*, 87 F.4th at 1345, 1347;

*Aqua Shield*, 774 F.3d at 772.  Moreover, because neither he nor Netlist presented

any incremental-cost evidence necessary to compute incremental profits, there is

no ***evidence*** concerning how the parties to the hypothetical negotiation would have

shared profits.  There is thus insufficient evidence to support Netlist's proffered

royalty.

Arguments implicating both methodology and sufficiency of the evidence

are proper.  Netlist's reliance on *Versata Software Inc. v. SAP America, Inc.*, 717

F.3d 1255 (Fed. Cir. 2013), is misplaced.  There, the Court rejected as "improperly

raised" ***pure*** *Daubert* challenges that the appellant disguised as JMOL arguments,

where the *Daubert* ruling itself was unappealed.  *Id.* at 1264.  Here, Samsung

challenges the sufficiency of Netlist's evidence and the district court's *Daubert*

ruling, which accepted Kennedy's "100% rule of thumb."  BB45-46.  Even if the

void in Netlist's evidence stemmed from a void in Kennedy's methodology, Netlist

still needed to adduce "legally sufficient evidence regarding an appropriate

reasonable royalty." *See ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010) (citation omitted).

None of Netlist's cases permit Kennedy to rely on revenues instead of profits. RB49-50. *Aro Manufacturing Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 504-07 (1964), concerns whether Congress eliminated profit disgorgement as a patent-infringement remedy. *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1344 (Fed. Cir. 2015), concerns whether the patentee could recover royalties for sales after patent expiration. In *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1238-39 (Fed. Cir. 2011), the Court held expected profits are not "an absolute limit to the amount of the reasonable royalty." Samsung does not contend otherwise; Samsung contends incremental profits are "conceptually central to constraining the royalty negotiation." *Aqua Shield*, 774 F.3d at 772 (citation omitted). Lastly, *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1555 (Fed. Cir. 1995), addresses whether a reasonable royalty can be based on the patentee's, rather than the infringer's, anticipated profits. None of these cases endorses using revenues alone to calculate a reasonable royalty, and this case presents a unique opportunity for this Court to provide additional guidance on the issue.

Incremental revenue does not constitute substantial evidence supporting the damages award.

16

### B.    Kennedy's 100%-of-Revenue Rule of Thumb Cannot Stand

Netlist does not dispute that Kennedy's proposal would ***guarantee Samsung a loss*** by surrendering 100% of its incremental revenues from the claimed inventions while also bearing all incremental costs and risks.  Nor does Netlist dispute that Kennedy's proposal exceeds the disgorgement remedy Congress abolished.  BB48.  It was "absurd" for Kennedy to opine that Samsung would agree to "pay a royalty in excess of what it expected to make in profit." *Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*, 895 F.2d 1403, 1408 (Fed. Cir. 1990).

Netlist's argument that this a *Daubert*, not sufficiency-of-the-evidence, challenge (RB52) again ignores that it is both.  Kennedy's methodology was "fundamentally flawed" because he applied a 100%-of-incremental-revenue rule of thumb that "fails to tie a reasonable royalty base to the facts."  *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011).  Moreover, neither Kennedy nor Netlist presented evidence that ***any*** licensee agreed to pay 100% of incremental revenues associated with patented technology, much less that Samsung would have been so irrational.  BB47-48.  *Versata* is distinguishable because Samsung's argument is not purely a *Daubert* challenge, and because Samsung appeals the district court's *Daubert* ruling here.  *Versata*, 717 F.3d at 1264.  Just

because Kennedy erred twice (once in his methodology and once in his evidentiary showing) does not preclude Samsung from challenging both errors.

Netlist cannot avoid *Lindemann*. Although the proposed royalty in *Lindemann* exceeded the infringer's expected profits on the "entire machine," whereas Kennedy's proposed royalty exceeded Samsung's expected profits on the accused features, that distinction is immaterial. In both scenarios, the hypothetical licensee irrationally takes a loss to license the asserted patents. No rational company would agree to that. *Lindemann*, 895 F.2d at 1408.

Netlist's arguments that Samsung would abandon common sense and accept a 100%-of-incremental-revenues royalty wither under scrutiny:

Netlist cites the JDLA as evidence that Samsung supposedly "really need[ed] Netlist technology." RB47. Elsewhere, Netlist defends Kennedy's decision to *disregard* the JDLA as "not comparable." RB66-68. Netlist cannot tout the JDLA as evidence of the value Samsung assigned the asserted patents while also ignoring the amount Samsung paid. Regardless, Samsung's agreeing to the JDLA means only that Samsung thought the JDLA was a worthwhile deal for the reasonable price Netlist wanted the jury to ignore. Samsung's decision to license the patents before does not suggest Samsung would agree to license them at a higher price, particularly at a guaranteed loss.

18

Netlist asserts the memory-module market is "cutthroat" with "extreme competitive pressures," but no record evidence supports that attorney argument. RB47, 53. At most, the evidence demonstrates an essentially three-player market, which says nothing about whether the market is "cutthroat" or "extreme." Appx5712 (706:4-14).

Netlist speculates (RB53) that, although Samsung would lose money under Kennedy's proposal, "that was preferable to losing sales entirely to Micron or SK hynix." There is no record evidence that Samsung would have lost sales to Micron or SK hynix had it omitted the accused features from its products. Although Kennedy testified Micron and SK hynix "would willingly take those sales if [Samsung] couldn't offer that technology," Appx5712 (706:10-14), such "[c]onclusory allegations, speculation, and unsubstantiated assertions are not evidence." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999) (citation omitted).

Netlist asserts its technology was "particularly important" to Samsung. RB48 (quoting Appx5700). Yet, no witness uttered those words. The quoted language comes from Netlist's counsel, not witness testimony. Appx5700 (694:10-22). Netlist's loaded question is not evidence and cannot support Kennedy's 100%-of-incremental-revenue rule of thumb.

Netlist argues the jury "moot[ed]" Samsung's challenge to Kennedy's 100%-of-incremental-revenue rule of thumb by awarding only 75% of Kennedy's request.  RB54.  Netlist raised the same argument in the district court in opposing JMOL, and the district court correctly rejected it as "irrelevant" and "unavailing." Appx48.  "Beginning from a fundamentally flawed premise and adjusting it . . . nevertheless results in a fundamentally flawed conclusion."  *Uniloc*, 632 F.3d at 1317.  As Netlist acknowledged, the jury awarded "***exactly*** 75% of the proposed sum for each accused product family."  Appx18147.  The jury therefore relied on Kennedy's unsupported 100% royalty rate and merely "adjust[ed] it," "result[ing] in a fundamentally flawed conclusion."  *Uniloc*, 632 F.3d at 1317.

None of Netlist's "evidence" demonstrates that Samsung would have agreed to a royalty rate above the profit-making potential of the claimed technology, and certainly no evidence demonstrates that Samsung would have agreed to take a guaranteed loss.  Substantial evidence does not support Kennedy's 100%-of-incremental-revenue rule of thumb.

### C.  Substantial Evidence Does Not Support Kennedy's Failed Apportionment Attempts

#### 1.  The '054 and '918 Patents' Alleged Technical Benefit Includes Unpatented and/or Prior-Art Features

Netlist does not dispute that the alleged technical benefit of the '054 and '918 patents—the accused DDR5 products' on-module PMIC—includes

unpatented features.  *See* RB55-57.  Instead, Netlist misapplies *AstraZeneca* to argue that Kennedy did not need to subtract those unpatented features' value from his damages analysis.  RB56.

In *AstraZeneca*, the asserted patents "cover[ed] the infringing product ***as a whole***" and "constitute[d] the ***complete*** [accused] product"; there was "no unpatented or non-infringing feature in the product."  782 F.3d 1324 at 1338.  Accordingly, the Court held "the value of all conventional elements" did not need to be "subtracted" because "nothing would remain."  *Id.* at 1339 (quotation marks omitted).  Here, Netlist does not dispute that the accused products include significant unpatented features (e.g., "Power Management" component, "Power Meter," and "LDO 1").  Appx22226 (citing Appx8068).

Netlist argues in passing that Kennedy apportioned out the value of "any conventional elements within the PMIC" by using a noninfringing alternative also having a PMIC.  RB56-57.  Yet, Netlist cites no record evidence showing this noninfringing alternative includes the same unpatented features as the accused products.  Appx22226 (citing Appx8068).

Because Netlist did not "give evidence tending to separate or apportion" the value of the accused PMIC's unpatented features, substantial evidence does not support the damages award.  *Garretson v. Clark*, 111 U.S. 120, 121 (1884); *see also VLSI*, 87 F.4th at 1345.

### 2. The '339 Patent's Alleged Technical Benefit Is Unpatented and in the Prior Art

Per Samsung's opening brief (BB51-52), the district court relied on circular testimony to deny JMOL on the '339 patent damages. Netlist does not attempt to defend the district court's reasoning.

Instead, Netlist pivots to Mangione-Smith's convoluted testimony that the ability to use two DIMMs per channel is somehow tied to the '339 patent's buffer architecture. RB57. But as Samsung's opening brief explains (BB52), Mangione-Smith conceded such buffers existed in prior art. Appx5459 (456:14-22).[3] Samsung also explained (BB52) that its technical expert presented *unrebutted* evidence that distributed buffers were "well-known in the art by 2009." Appx5934-35. Netlist's brief does not address this unrebutted evidence.

Because Netlist failed to adduce evidence that using two DIMMs per channel is a patented feature and failed to rebut Samsung's evidence that this feature was known, the '339 damages verdict lacks substantial-evidence support.

### 3. The '060 and '160 Patents' Alleged Technical Benefit Is Unpatented and in the Prior Art

As Samsung explained (BB52), Kennedy computed damages for the '060 and '160 patents using the unsupported assumption that they allow Samsung to sell eight-high DIMMs. Netlist cites Brogioli's conclusory testimony that the '060 and

---

[3] Samsung's opening brief inadvertently attributed this testimony to Brogioli.

'160 patents' "array grouping strategy" was supposedly "necessary" for eight-high stacks. RB58. Netlist does not, however, dispute that prior art discloses eight-high stacks without the patented features. BB53; Appx1583-85. Thus, substantial evidence does not support the damages verdict.

### D.    Netlist Failed To Show Its Noninfringing Alternatives Were Available and Acceptable

To be legally sufficient, noninfringing alternatives must be available and acceptable because otherwise the alternative would be dismissed outright. BB53-55; *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1351 (Fed. Cir. 1999). Netlist tries (RB59) to cabin *Grain Processing* to the "lost-profits context," but its rationale applies equally to the reasonable-royalty context: "[A] rational would-be infringer is likely to offer an acceptable noninfringing alternative, if available, to compete with the patent owner rather than leave the market altogether." 185 F.3d at 1351; *see also In re Ecast, Inc.*, 96 F. App'x 710, 711 n.* (Fed. Cir. 2004) ("[U]nder Federal Circuit precedent evidence of the availability of an acceptable noninfringing alternative is relevant to a lost profits analysis, *see* [*Grain Processing*], and to a reasonable royalty analysis, *see Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1571-72 (Fed. Cir. 1996)."). Indeed, in *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1373 (Fed. Cir. 2008), this Court applied the "available and acceptable" requirement in the reasonable-royalty context. It rejected the defendant's noninfringing-alternative argument because

23

there was "no available and acceptable noninfringing alternative to which Coinco could have switched at the time of the hypothetical negotiation; there was merely the possibility that it could have come up with one." *Id.*

*Prism* does not (and cannot) overrule this Court's application of the "available and acceptable" requirement in the reasonable-royalty context. *Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1376 (Fed. Cir. 2017).[4] In choosing to advance alleged noninfringing alternatives to support its damages theories, Netlist bore the burden to prove they met the applicable standard. *See ResQNet.com*, 594 F.3d at 872 (discussing patentee's burden to prove "appropriate reasonable royalty"). Samsung "had no obligation to rebut until [Netlist] met its burden with reliable and sufficient evidence." *Id.* Nor did Samsung need to show any noninfringing alternative—its expert calculated damages based on comparable licenses. Appx6189-201.

The Court should set aside the damages award for this additional reason.

---

[4] Indeed, district courts that have addressed this question have uniformly held that, even in the reasonable-royalty context, a noninfringing alternative must be available and acceptable. *DataTreasury Corp. v. Wells Fargo & Co.*, No. 2:06-CV-72 DF, 2011 WL 8810604, at *9 (E.D. Tex. Aug. 2, 2011); *Fresenius Med. Care Holdings, Inc., v. Baxter Int'l, Inc.*, No. C 03–01431 SBA, 2006 WL 1646113, at *1 (N.D. Cal. June 12, 2006); *Albritton v. Acclarent, Inc.*, No. 3:16-CV-03340-M, 2020 WL 11627275, at *14 (N.D. Tex. Feb. 28, 2020).

**III.  The District Court Abused Its Discretion by Admitting Kennedy's Flawed Testimony**

**A.    The District Court Should Have Excluded Kennedy's Comparable License Analysis**

**1.    Netlist Acknowledges Its Technical Expert Failed To Analyze 99.4% of the Licensed Rambus Patents**

Netlist acknowledges Mangione-Smith "analyzed only a subset of the Rambus patents." RB63.  That alone shows the district court should have excluded the Rambus license—as it did in a subsequent trial between the *same* parties involving some of the *same* technology because the $1.1-billion license serves only to make Netlist's unsupported demand seem reasonable by comparison. BB58-60; *MLC Intell. Prop., LLC v. Micron Tech., Inc.*, 10 F.4th 1358, 1374-75 (Fed. Cir. 2021) (affirming license exclusion because expert "conducted no assessment of the licensed technology versus the accused technology" for 40 of 41 licensed patents); *Trell v. Marlee Elecs. Corp.*, 912 F.2d 1443, 1447 (Fed. Cir. 1990).

Samsung did not forfeit this argument.  *Contra* RB62.  Samsung argued before the district court that Netlist did not demonstrate the licensed Rambus patents' technical comparability.  Appx1489; Appx1490 n.11; Appx1686.  Netlist exalts form over substance arguing that Samsung did not name Mangione-Smith in its comparability challenge.  Netlist and the district court were on notice of

Samsung's position. *See Wash World Inc. v. Belanger Inc.*, 131 F.4th 1360, 1373 (Fed. Cir. 2025).

Netlist argues that analyzing only 0.6% of the licensed Rambus patents was "reasonable" because that fragment was "involved in the litigation between Samsung and Rambus" and "likely to have driven the value of the negotiation." RB63 (quotation marks omitted). This Court rejected a remarkably similar opinion the same expert, Mr. Kennedy, offered in *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 972 (Fed. Cir. 2022). There, as here, Kennedy alleged "a handful of valuable patents drive the royalty rate for a license," with the remaining portfolio included "for a marginal upcharge." *Id.* There, unlike here, Kennedy attempted to "separate the value of the key patents from the rest of the licensed portfolio" by "reduc[ing] the royalty rate by 25 percent." *Id.* at 973. Yet, this Court held that allowing Kennedy's comparable-license testimony was an abuse of discretion. *Id.* at 974. Kennedy's unrefined reliance on the Rambus license here is even less defensible than his excluded *Apple* opinion.

Netlist contends that the Rambus license arose under similar "circumstances" because it "was negotiated after Samsung's failure to perform under a previous license." RB61. Netlist appears to be referencing its breach-of-contract claims in *Netlist Inc. v. Samsung Electronics Co. Ltd.*, No. 8:20-cv-00993 (C.D. Cal.). There was no final judgment or verdict in that case when this case

was tried, and certainly these allegations could not inform the hypothetical negotiation.[5]  Even if the Rambus license arose in the wake of breach allegations, that does not overcome the lack of technical comparability and the unfair prejudice from Netlist's harping on the $1.1 billion Samsung paid Rambus.  Netlist presented this big number simply to make its unsupported demand seem reasonable.

Netlist alleges Kennedy's passing statement that the Rambus license "should not be used to calculate the specific royalty" neutralizes the anchoring effect of his repeated testimony that Samsung paid Rambus $1.1 billion.  RB62 (quoting Appx5748 (742:17-22)).  However, not even a trial judge's "curative jury instruction" can "offset the resulting unfair prejudice" of introducing exorbitant figures with "no demonstrated correlation to the value of the patented feature alone."  *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 68 (Fed. Cir. 2012); *see also Uniloc*, 632 F.3d at 1320.

Netlist's attempt to distinguish *LaserDynamics* and *Uniloc* as concerning the accused products' total revenues rather than a defendant's previous license payment is superficial.  RB65.  *Uniloc* and *LaserDynamics* held that introducing unapportioned large total revenues makes "a patentee's proffered damages amount appear modest by comparison," and "artificially inflate[s] the jury's damages

---

[5] Although a jury later found that Samsung breached the JDLA, *id.*, Doc. 775 (Apr. 7, 2025), Samsung's challenge to that verdict is pending.

calculation." *LaserDynamics*, 694 F.3d at 68 (quotation marks and citation omitted). That concern applies equally here. The Rambus license has "no demonstrated correlation to the value of the patented feature[s] alone" because Mangione-Smith did not analyze 99.4% of the licensed patents, much less demonstrate comparability. *Id.* Thus, the Rambus license served only to make Kennedy's proposed royalty "appear modest by comparison, and to artificially inflate the jury's damages calculation." *Id.*[6]

Netlist attempts to distinguish *MLC* because the expert failed to "apportion damages to the value of the patented invention" or show "the prior license involved comparable technology," but that is true here too. BB48-55, 58-60. To distinguish *Trell*, Netlist argues the jury here was "told not to rely on the Rambus license in setting a royalty rate." RB64. As explained above, Kennedy's attempted "curative instruction" (not the district court's) could not offset the unfair prejudice of the Rambus license. Netlist also asserts (*id.*) that the jury supposedly "considered the differences between the Rambus license and the asserted patents," but not even Netlist's experts did that, making it impossible for the jury to have done so.

---

[6] Although Samsung's counsel "mention[ed] the $1.1 billion figure" when cross-examining Kennedy (RB65), Netlist had repeatedly let the $1.1 billion cat out of the bag by then, and so the unfair prejudice already existed. Appx5693 (687:9-14); Appx5697 (691:12-23); Appx5698 (692:8-10).

Netlist argues the jury awarded less than Netlist requested, and so there is "no reason to think the Rambus license **actually** skewed the jury's damages horizon." RB65 (emphasis original). Netlist flips the *Daubert* standard on its head. The *Daubert* standard requires courts to weigh *ex ante* the "possible prejudice" of allowing an expert's testimony; it does not permit courts *ex post* to speculate about the actual prejudice caused by the testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993). The district court so recognized: "Netlist's argument that the jury only awarded 75% of what Netlist requested is irrelevant and therefore unavailing." Appx48.

Nevertheless, there **is** reason to believe the Rambus license skewed the damages horizon. As Netlist acknowledged, the jury awarded "**exactly** 75% of [Kennedy's] proposed sum for each accused product family." Appx18147. The jury thus relied on Kennedy's analysis, which trumpeted the Rambus license's big number repeatedly. Appx5693 (687:9-19); Appx5698-99 (692:22-693:4). Thus, the jury's award is "supported in part by the faulty foundation" of the Rambus license. *Uniloc*, 632 F.3d at 1321.

Finally, the district court's exclusion of the Rambus license in a subsequent trial between the **same** parties involving some of the **same** technology is not a "red herring." RB63. Netlist's acknowledgment that the district court did not explain its basis for that exclusion proves Samsung's point. Having seen the Rambus

29

license misused in the first trial, the district court excluded it the second time around without explanation.  The district court abused its discretion in allowing Netlist to use the Rambus license, and a new damages trial is necessary.

### 2. Netlist Fails To Address the Inconsistency in Kennedy's Treatment of the Rambus, JDLA, and SK hynix Licenses

Kennedy treated the Rambus, JDLA, and SK hynix licenses inconsistently: he disregarded the latter two licenses because they include non-cash consideration, yet touted the Rambus license despite its non-cash consideration.  BB61.  Rather than addressing that inconsistency, Netlist repeats it, arguing the JDLA and SK hynix licenses are non-comparable because they contain non-cash consideration.  RB66.  Netlist does not dispute, however, that the Rambus license *also* contains non-cash consideration: a cross-license to Samsung's patents.  Appx5693 (687:9-14); Appx5697 (691:12-23); Appx5790 (784:9-13).  Kennedy should have either disregarded or analyzed all three licenses to account for alleged non-cash consideration.  The district court abused its discretion in allowing Kennedy to apply a double standard instead.

### B. Kennedy's Parroting of Groehn's Regression Analysis Requires a New Damages Trial

### 1. Testifying Experts Cannot Be Mouthpieces for Non-Testifying Experts

Kennedy presented Groehn's *out-of-court* regression analysis, "in effect becom[ing] the mouthpiece of" Groehn, for his '054 and '918 patent damages

opinion. *Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 524 (5th Cir. 2013) (quotation marks and citation omitted). That requires a new trial.

Netlist's odd contention (RB68-69) that Samsung waived its objection by not calling Groehn adversely misunderstands Samsung's argument. Samsung's argument is that it was improper for Kennedy to be the mouthpiece of an expert opinion not in evidence. BB62-64. Calling Groehn adversely would not have cured this problem—***nor was it Samsung's problem to fix***. Netlist left a hole in its trial presentation and now wrongly blames Samsung for not plugging it.

The Court should also reject Netlist's mootness argument. RB69. In *Acceleration Bay LLC v. 2K Sports, Inc.*, 15 F.4th 1069, 1076 (Fed. Cir. 2021), the district court granted summary judgment on two "independent grounds," but the patentee addressed only one on appeal, rendering the appeal moot. Here, there are not multiple "independent grounds" for rejecting Samsung's appeal argument. *See* Appx56-58. Netlist cites the district court's waiver determination concerning a different argument Samsung is not pursuing on appeal—that Netlist's failure to call Groehn at trial deprived Samsung the opportunity to cross-examine him. *Id.*; BB62-64. The waiver determination is irrelevant.

Samsung acknowledges Netlist's assertion that "[e]xperts routinely rely upon other experts." RB69 (quoting *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1321 (Fed. Cir. 2014)). Indeed, patent damages experts often rely on technical

experts who testify on the claimed invention's "technical benefits." *VLSI*, 87 F.4th at 1347. Here, though, the relied-upon expert opinion is not in evidence because Groehn did not testify at trial, and Kennedy thus became his improper "mouthpiece." *Factory Mut. Ins.*, 705 F.3d at 524 (quotation marks and citation omitted); *see also Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 409 (6th Cir. 2006); *United States v. Grey Bear*, 883 F.2d 1382, 1392-93 (8th Cir. 1989).

Netlist's reliance on *Arctic Cat* and *Apple* is misplaced. In *Arctic Cat*, the relied-upon expert ***testified at trial***; Groehn did not. *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1365, 1369-70 (Fed. Cir. 2017). In *Apple*, there was no trial. 757 F.3d at 1294. Netlist's reliance on *Ferrera & DiMercurio v. St. Paul Mercury Ins. Co.*, 240 F.3d 1 (1st Cir. 2001), is puzzling. *Ferrera* neither mentions a "damages expert" nor discusses what is "expected" of such witnesses. *Contra* RB70. Unlike here, *Ferrera* concerned an expert who provided "his own" opinion based on "first-hand knowledge" of the "observable facts" he gleaned personally. 240 F.3d at 9.

Despite observing there is "no ***general*** requirement" that a relied-upon expert testify, *Dura Automotive* held that a testifying expert may ***not "parrot[] the opinion of an expert" who is not testifying***, especially where, as here, the non-testifying expert's opinion goes "beyond the [testifying] expert's ken." *Dura Auto.*

32

*Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002) (first emphasis original). *Dura Automotive* barred exactly what Kennedy did here: "vouching for the truth of what the [non-testifying expert] had told him—of becoming in short the [non-testifying expert's] spokesman." *Id.*

### 2.    Groehn's DDR4 Regression Analysis Ignores DDR5 Prices

Kennedy's reliance on Groehn's flawed DDR4 regression analysis to calculate damages for DDR5 products was arbitrary because there is no evidence that DDR4 and DDR5 products share a speed-to-price ratio. BB64-65. Netlist's response—that DDR4 and DDR5 products are used "in the same kinds of applications" and serve the same markets (RB71)—says nothing about their relative speed-to-price ratios. This evidentiary gap goes to the admissibility of Kennedy's DDR5 damages opinion, not its weight. *See* Fed. R. Evid. 702(b) (expert testimony must be "based on sufficient facts or data"). It was an abuse of discretion to allow Kennedy to base his DDR5 damages opinion on Groehn's DDR4 regression analysis.

Finally, Netlist's attempt to rehabilitate Groehn's analysis underscores its flaws. RB73. Netlist argues the "confidence interval" Groehn computed shows there was no multicollinearity, but his confidence interval (±0.9%) was *64%* of his "point estimate" (1.4%), confirming multicollinearity plagued his analysis. Appx1679 (162:23-163:5). This confidence interval equates to a damages range so

wide ($196M $\pm$ ***$126M***) that it cannot be reliable. *See* Appx5704-05. Moreover,

Groehn never explained how confidence interval relates to multicollinearity. The

district court abused its discretion allowing Groehn's flawed analysis.

## CONCLUSION

The Court should reverse the district court's denial of Samsung's motion for

JMOL or a new trial.


Dated: May 19, 2025                    Respectfully submitted,


                                       */s/ Ruffin B. Cordell*
                                       Ruffin B. Cordell
                                       Lauren A. Degnan
                                       Michael J. McKeon
                                       Michael J. Ballanco
                                       Benjamin J. Christoff
                                       FISH & RICHARDSON P.C.
                                       1000 Maine Avenue, S.W., Suite 1000
                                       Washington, DC 20054
                                       Telephone: (202) 783-5070

                                       Francis J. Albert
                                       FISH & RICHARDSON P.C.
                                       12860 El Camino Real, Suite 400
                                       San Diego, CA 92130
                                       Telephone: (858) 678-5070

                                       Alexander Pechette
                                       FISH & RICHARDSON P.C.
                                       One Marina Park Drive, Suite 1700
                                       Boston, MA 02210
                                       Telephone: (617) 542-5070

                                       ***Attorneys for Defendants-Appellants***

## <u>CERTIFICATE OF SERVICE AND FILING</u>

I certify that on May 19, 2025, I electronically filed the foregoing **REPLY BRIEF** of Defendants-Appellants using the Court's CM/ECF filing system. Counsel for Plaintiff-Appellee Netlist, Inc. were electronically served by and through the Court's CM/ECF filing system per Fed. R. App. P. 25 and Fed. Cir. R. 25(e).

*/s/ Ruffin B. Cordell*
Ruffin B. Cordell

# <u>CERTIFICATE OF COMPLIANCE</u>

The **REPLY BRIEF** of Defendants-Appellants is submitted in accordance with the type-volume limitation of Fed. Cir. R. 32(b).  The brief contains 6953 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2).  This brief has been prepared in a proportionally spaced typeface using Microsoft® Word for Microsoft 365 in Times New Roman, 14 Point.

Dated: May 19, 2025                    */s/ Ruffin B. Cordell*
                                        Ruffin B. Cordell